FILED

2025 Sep-03  AM 11:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| **LACINDA D. CASEY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:24-cv-00866-RDP** |
| | } | |
| **SOCIAL SECURITY** | } | |
| **ADMINISTRATION, COMMISSIONER,** | } | |
| | } | |
| **Defendant.** | } | |

### <u>MEMORANDUM OF DECISION</u>

Plaintiff Lacinda D. Casey ("Plaintiff") filed this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") that denied her claims for a period of disability and disability insurance benefits ("DIB"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed and this matter remanded.

## I.    Proceedings Below

Plaintiff filed her application for a period of disability and DIB on May 18, 2021 (Tr. 100), alleging a disability onset date of November 24, 2014. (Tr. 101). The application was denied initially on October 13, 2021, and on reconsideration on March 16, 2022. (Tr. 111, 117). After a telephone hearing held on July 6, 2023 (Tr. 67-90, 176), Administrative Law Judge Emilie Kraft ("ALJ") issued a decision on September 15, 2023, finding Plaintiff was not disabled from November 24, 2014 through her date last insured, December 31, 2019. (Tr. 23-39). On May 1, 2024, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 1). That

decision became the final determination of the Commissioner, and therefore a proper subject of this court's appellate review.

## II.    The Hearing and Record Evidence

Plaintiff was sixty years old at the time of the July 6, 2023 hearing. (Tr. 72). She attended two years at a junior college but did not receive any kind of degree. (Tr. 72, 228). Plaintiff has previous work experience as an office manager and accounting clerk. (Tr. 78-79, 228-29). She alleges that she suffers from the following: problems with her left knee and back, heart problems, high blood pressure, rheumatoid arthritis, a right hip replacement, breathing problems, a tear in her right rotator cuff, obesity, anxiety, depression, and high cholesterol. (Tr. 92). Rather than review the evidence chronologically, the court presents it by separately discussing Plaintiff's various complaints and diagnoses.

According to Plaintiff's hearing testimony, she left her last job in October 2014 because of problems with her left knee. (Tr. 73). Plaintiff testified that she had two knee replacements on her left knee and also received a nerve block to that same knee in 2018. (Tr. 73, 926, 547). She complains that she cannot stand for long periods of time because her knee "goes out" on her. (Tr. 74). She testified that she cannot stand for over a period of three minutes. (*Id.*). Plaintiff further testified that one time, after she had been standing for a period of time, her "knees buckled" out from under her causing her to twist her left foot, which led to surgery on her left foot. (Tr. 75). Plaintiff also cannot sit for long periods of time; indeed, she testified that she can only sit for twenty to thirty minutes before having to get up and move around. (Tr. 74).

Plaintiff also testified that she suffers from issues with her right hip. (*Id.*). At the hearing, she stated that she had a hip replacement in 2016, but even after that surgery she still experiences

pain when she goes up and down stairs. (*Id.*). Plaintiff also testified that due to her hip pain, she and her husband had to sell their multi-level house. (*Id.*).

Plaintiff also complained about her back. (Tr. 75). She stated that she has had multiple epidurals in her back to help control pain. (*Id.*). She reports two of the vertebrae are pressing together causing back pain as well as disc protrusions in her back and neck. (*Id.*). Plaintiff complained that the protrusion in her neck makes her shoulders ache and causes her arms and fingertips to go numb. (*Id.*). Plaintiff testified that when doing activities such as keyboarding or sewing, she can only use her hands for a period of fifteen to twenty minutes before experiencing those symptoms. (Tr. 75-76). When this occurs, she has to wait until the next day before she can resume those activities. (*Id.*).

Plaintiff also testified that she received a block in her lower back for left leg pain in 2015. (*Id.*). She underwent that procedure to avoid a knee replacement. (*Id.*).

At the hearing, Plaintiff also complained about carpel tunnel syndrome. (*Id.*). She stated that she had surgery on her right wrist around ten years earlier and that following the surgery, her right hand has affected her handwriting abilities. (Tr. 76-77). She cannot write well and that the carpel tunnel still causes her pain and numbness at times. (*Id.*). Plaintiff also testified that she had a left wrist fracture, which required surgical repair, and a nerve block in August 2018. (*Id.*). Plaintiff stated that since that surgery her left wrist has continued to hurt and the surgery has caused her to lose strength in both her wrist and hand. (*Id.*).

Plaintiff also testified that she has irritable bowel syndrome. (*Id.*). She stated that her stomach cramps and she has to go to the bathroom around five to seven times a day. (*Id.*). At least once a day she has an accident where she does not make it to the bathroom, which requires her to

shower and change her clothes. (*Id.*). Plaintiff testified that it takes her roughly five to ten minutes each time she goes to the bathroom. (*Id.*).

Plaintiff stated that she was diagnosed with depression in 2014 and has been treated for it continuously since then. (Tr. 78). She takes Lexapro every day and Xanax as needed. (Tr. 77). Plaintiff testified that when she gets depressed, she starts crying, gets anxious, and physically shakes "for no reason." (Tr. 82). She further testified that she has to lie down once a day for fifteen/twenty minutes (sometimes up to an hour) because she gets "extremely nervous." (Tr. 81). Plaintiff stated that she did not receive any mental health treatment for her depression, such as visit a therapist or go to the hospital. (Tr. 82).

In addition to lying down because she gets nervous, Plaintiff also complained that she has to lie down during the day because of her physical conditions as her knees, back, and arms will hurt. (Tr. 81). Plaintiff stated that she has to lie down and stretch to get relief from the pain in her body. (*Id.*). Plaintiff testified that between the hours of 8:00 a.m. and 5:00 p.m. she would typically spend two to three hours lying down and stretching because of her physical problems. (*Id.*).

Plaintiff first started experiencing back pain in 2009. (Tr. 966). On September 10, 2009, she saw Dr. Christopher Kelly, who recommended an MRI after Plaintiff's complaints of pain in her right leg and back (which she had been experiencing for several months). (*Id.*). On September 15, 2009  Plaintiff underwent an MRI that revealed posterior central disc protrusions at L4-5 and L5-S1. (Tr. 411). On September 21, 2009, Plaintiff was seen for a follow-up appointment with Dr. Kelly. (Tr. 967). Dr. Kelly noted a herniated disc in Plaintiff's back and arranged for her to receive an epidural. (*Id.*). In February 2011, Plaintiff saw Dr. Zenko Hrynkiw for back pain. (Tr. 395, 400-405). After assessing Plaintiff's cervical and lumbar myelogram and post-myelogram CAT scan, he noted that Plaintiff had disc bulges at C5-6, C6-7, and L5-S1. (Tr. 395). In June 2016, Plaintiff

4

saw Dr. Hrynkiw again with complaints of lower back pain and right hip pain that shoots down her right leg to her foot. (Tr. 455, 460). Plaintiff stated that the pain was a 9/10. (Tr. 451). Dr. Hrynkiw noted that Plaintiff presented with right sciatic pain, but after reviewing Plaintiff's myelogram CT scan and seeing mild spondylosis with a central disc protrusion at L4-L5, he did not think that was causing her right sciatic pain. (Tr. 447). Dr. Hrynkiw also performed an MRI scan, but the MRI did "not explain [Plaintiff's] right sciatic pain." (Tr. 460). Dr. Hrynkiw also noted that Plaintiff said the epidural blocks she had received did not help with the pain. (Tr. 460, 451).

Over the course of several years, Plaintiff saw Dr. Bradley Goodman and received epidural steroid injections for low back pain, lumbar spondylosis, and lumbar degenerative disc disease. (Tr. 475-77, 479-83). She received these injections in October 2011 (Tr. 481), March 2012 (Tr. 482), November 2012 (Tr. 483), April 2014 (Tr. 479), November 2014 (Tr. 480), December 2014 (Tr. 475), May 2016 (Tr. 477), and June 2016. (Tr. 475). Plaintiff also saw Dr. Srinivas Mallempati on July 16, 2015 for a block at left L2/3. (Tr. 439). Dr. Mallempati noted in both the pre-operative diagnosis and post-operative diagnosis that Plaintiff had (1) Reflex sympathetic Dystrophy ("RSD") Lower Extremity and (2) Foot pain. (*Id.*).

On July 2, 2012, Plaintiff saw Dr. Christopher Kelley who performed a left knee arthroscopy with medial and lateral meniscectomy. (Tr. 1244-45). On March 3, 2015, Plaintiff saw Dr. Kelley with complaints of knee pain radiating to the left thigh. (Tr. 823). Plaintiff complained that the pain was aching and she described the symptoms as severe. (*Id.*). She also complained that the symptoms were exacerbated by walking and relieved by rest. (*Id.*). Plaintiff was noted to have a medial meniscus tear and X-ray imaging of her left knee showed moderate arthrosis. (Tr. 824-25). She saw Dr. Kelley again on March 12, 2015 to discuss the results of an MRI she had on her

left knee on March 10, 2015. (Tr. 819). The MRI showed a tearing of the body and posterior horn of the medial meniscus and severe chondromalacia of the patellar apex and medial femoral condyle. (Tr. 820). An X-ray of Plaintiff's left knee showed moderate arthrosis with irregularity of the medial femoral condyle, mild irregularity of the lateral femoral condyle, and tibial spine peaking. (*Id.*). On April 3, 2015, Plaintiff saw Dr. Kelley who performed a left knee arthroscopy with partial medial meniscectomy. (Tr. 1003).

On April 10, 2015, Plaintiff was seen for a post-operative visit. (Tr. 1018). Plaintiff's symptoms were much improved compared to preoperative. (*Id.*). On May 11, 2015, Plaintiff was seen for another post-operative visit. (Tr. 610). Her symptoms were much improved and she had no post operative complications. (*Id.*). On May 25, 2015, Plaintiff saw Dr. Kelley complaining of severe pain in her left knee. (Tr. 809). She had no postoperative complications. (*Id.*). X-ray imaging showed that Plaintiff had mild osteoarthritis. (Tr. 808).

On June 16, 2015, Plaintiff saw Dr. Geoffrey Connor for a second opinion complaining of left knee pain and swelling following her knee surgery. (Tr. 484). Plaintiff informed Dr. Connor that her symptoms had initially improved following surgery, but they returned and were the same as they were pre-surgery. (*Id.*). X-ray imaging of her left knee showed mild medial joint space narrowing. (*Id.*). On June 16 and June 25, 2015, Plaintiff underwent Synvisc therapy of the left knee. (Tr. 485, 486).

On July 9, 2015, Plaintiff saw Dr. Connor reporting no improvement with her left knee pain and swelling. (Tr. 487). Dr. Connor recommended that Plaintiff see Dr. Mallempati to assess for a possible block before she considered a total knee arthroplasty. (*Id.*). On August 5, 2015, she saw Dr. Connor and informed him that the conservative measures to mitigate her pain had not

worked, so she wanted to go forward with a total left knee arthroplasty. (Tr. 489). On August 31, 2015, Plaintiff underwent a left knee replacement. (Tr. 490-92).

Plaintiff saw Dr. Connor again on September 11, 2015 and December 2, 2015, with essentially no complaints following the knee arthroplasty. (Tr. 494-95). In September 2016, Plaintiff saw Dr. Connor complaining of left knee pain and swelling after an injury while on vacation. (Tr. 1091). X-ray imaging showed Plaintiff's total knee arthroscopy to be well fixed and positioned. (*Id.*). The impression was left knee MCL sprain. (*Id.*). On December 14, 2016, Plaintiff saw Dr. Connor for a follow-up visit who noted that Plaintiff was doing well and her total knee arthroscopy was well fixed and positioned. (Tr. 1092).

On June 21, 2016, Plaintiff complained to Dr. Hrynkiw of right hip pain, which she explained shoots down her right leg to her foot. (Tr. 462). On June 30, 2016, Plaintiff saw Dr. Connor complaining of right hip pain. (Tr. 496). Dr. Connor noted that Plaintiff's pain would worsen when she performed activities. (*Id.*). She tried anti-inflammatories and rest to improve her symptoms. (*Id.*). Dr. Connor noted degenerative joint disease in the right hip. (*Id.*). Plaintiff told Dr. Connor that she wanted to move forward with a total hip arthroplasty. (*Id.*).

On July 12, 2016, Plaintiff saw Dr. Hrynkiw with complaints of right hip and right leg pain. (Tr. 458). Plaintiff indicated that her pain was the same and she had experienced no changes since her last visit; she described her pain as a 9/10. (Tr. 458-59). On August 2, 2016, Dr. Connor performed a right total hip arthroplasty. (Tr. 500). On December 14, 2016, Plaintiff saw Dr. Connor for a follow visit after her hip arthroplasty. (Tr. 507). Plaintiff was doing well. (*Id.*).

Dr. Debora Reiland is Plaintiff's general practice doctor. (Tr. 52). Plaintiff saw Dr. Reiland yearly from 2014 to 2019. (Tr. 518, 514, 511, 508, 521, 568). Every time Dr. Reiland saw Plaintiff she noted in her assessment that Plaintiff had generalized osteoarthrosis, involving multiple sites.

7

(Tr. 519, 515, 513, 510, 523, 570). After each depression screening, Dr. Reiland noted that Plaintiff had "minimal depression." (Tr. 518, 514, 511, 508, 521, 568).

Plaintiff has also experienced issues related to carpal tunnel syndrome. She saw Dr. Hrynkiw on January 8, 2007 related to her left wrist. (Tr. 399). Dr. Hrynkiw noted that Plaintiff "had a right carpal tunnel in the past with repetitive motion at work." (*Id.*). He also noted that Plaintiff "probably will need carpal tunnel release." (*Id.*). Plaintiff saw Dr. Hrynkiw again on January 30, 2007 for carpal tunnel issues. (Tr. 398). She complained of left arm pain and numbness. (*Id.*).

At the July 6, 2023 hearing, the ALJ asked a vocational expert ("VE") to consider a hypothetical individual with the same age, education level, and past work experience as Plaintiff with the following limitations: able to only perform medium work; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle with the left upper extremity; and no exposure to unprotected heights, hazardous machinery or commercial driving. (Tr. 86). The VE testified that such a hypothetical individual would be able to perform the following jobs at the light level work: accounting clerk, composite job service dispatch, office manager, and administrative clerk. (Tr. 86-87).

The ALJ then asked the VE if there were some jobs in the national economy that a person with those limitations could perform. (Tr. 87). The VE responded that such a hypothetical person could be a cashier, storage facility rental clerk, and collator-operator. (*Id.*). The ALJ then asked the VE if the same jobs would be available for a hypothetical individual with the same limitations but a reduced residual functional capacity ("RFC") to sedentary work. (Tr. 87-88). The VE responded that the accounting clerk and composite job service dispatch would remain viable options based on how they are generally undertaken, but not as Plaintiff previously performed

them. (Tr. 88). The VE further responded that the administrative clerk past work would be precluded. (*Id.*).

Plaintiff's counsel questioned the VE about whether off-task behavior is generally tolerated in the jobs she identified. (*Id.*). The VE stated that based on her professional education, experience, and training, "ten percent or more time off task would preclude competitive employment." (Tr. 89). Plaintiff's counsel also asked whether there would be any jobs available to a hypothetical person of Plaintiff's age, education, and work experience who has "only the occasional use of the hands for handling, fingering, and feeling" and "had to lie down two to three hours per day. (*Id.*). The VE stated the identified jobs would not be available for this hypothetical person. (*Id.*). Additionally, Plaintiff's counsel asked whether the identified jobs would be available to a hypothetical person with the following limitations: (1) one who "must lie down two to three hours per day[;]" and (2) one "who must take five to seven bathroom breaks a day." (*Id.*). The VE stated that accommodations would be required for these hypothetical individuals and would thus preclude competitive employment. (*Id.*).

## III.    ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is defined as activity that is both "substantial" and "gainful." *Id.* § 1572. "Substantial" work activity is work that involves doing significant physical or mental activities. *Id.* § 404.1572(a). "Gainful" work activity is work that is done for pay or profit. *Id.* § 404.1572(b). If the ALJ finds that the claimant engages in activity that meets both of these criteria, then the claimant cannot claim disability. *Id.* § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of

medical impairments that significantly limits the claimant's ability to perform basic work activities. *Id.* § 404.1520(a)(4)(ii). Absent such impairment, the claimant may not claim disability. *Id.* Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See id.* §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. *Id.* § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's RFC, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step. *Id.* § 404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience. *Id.* § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. *Id.* §§ 404.1520(g), 404.1560(c).

The ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of November 24, 2014 through her date last insured of December 31, 2019. (Tr. 25). Based on the medical evidence presented, the ALJ concluded that Plaintiff had the following severe impairment through her date last insured: lumbar spondylosis

and degenerative disc disease; knee impairment status post replacement; degenerative joint disease of the right hip; and obesity. (*Id.*). Nevertheless, the ALJ determined that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 34).

After consideration of the entire record, the ALJ determined that through the date last insured, Plaintiff had the RFC to perform light work (as defined in 20 C.F.R. § 404.1567(b)) with the following limitations: she can occasionally climb ramps and stairs; she can never climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, and crawl; she can frequently handle with the left upper extremity; and she can have no exposure to unprotected heights, hazardous machinery, or commercial driving. (Tr. 34).

Based on this RFC, the ALJ concluded that through the date of last insured, Plaintiff was capable of performing her past relevant work. (Tr. 37). The ALJ concluded that based on the testimony of the VE through the date last insured, and considering Plaintiff's age, education, work experience, and RFC, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 39). Therefore, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time from November 24, 2014, the alleged onset date, through December 31, 2019, the date last insured. (*Id.*).

## IV.   Plaintiff's Argument for Remand

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the denial of review by the Appeals Council, reversed. (Doc. # 11). In support of her position, Plaintiff presents four arguments. First, Plaintiff argues that the ALJ erred when she failed to consider Plaintiff's RSD and apply SSR 03-2p. Second, Plaintiff argues that the

ALJ erred when she did not develop the record by ordering a consultative examination to evaluate Plaintiff's mental impairments and related limitations. Third, Plaintiff argues that the Appeals Council erred when it denied review despite the receipt of additional evidence. Finally, Plaintiff argues that the ALJ's decision was not supported by substantial evidence. (Doc. # 11 at 2).

## V.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings are limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## VI.    Discussion

After careful review and for the reasons stated below, the court concludes that the ALJ

failed to consider Plaintiff's RSD diagnosis at step two of the sequential evaluation process.

### A.    Whether the ALJ properly considered Plaintiff's RSD diagnosis and applied SSR 03-2p.

Reflex Sympathetic Dystrophy ("RSD") is "also frequently known as Complex Regional

Pain Syndrome, Type I (CRPS)." SSR 03-2p, Fed. Reg., 59971, 59972 (Oct. 20, 2003) ("SSR 03-

2p"). The terms are "used to describe a constellation of symptoms and signs that may occur

following an injury to bone or soft tissue." *Id.* RSD is "a chronic pain syndrome most often

resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury

affecting other parts of the body." *Id.* "The most common acute clinical manifestations include

complaints of intense pain and findings indicative of autonomic dysfunction at the site of the

precipitating trauma. . . . It is characteristic of this syndrome that the degree of pain reported is out

of proportion to the severity of the injury sustained by the individual." *Id.* The presence of RSD

can be established when an individual has complaints of pain that are associated with "swelling;

autonomic instability – seen as changes in skin color or texture, changes in sweating (decreased or

excessive sweating), skin temperature changes, or abnormal pilomotor erection (gooseflesh);

abnormal hair or nail growth   . . . ; osteoporosis; or involuntary movements of the affected region

of the initial injury." *Id.*

"The pathogenesis of RSD is not entirely understood, and it is not a Listed Impairment

under the Regulations. The Social Security Administration has recognized both of these facts and

has issued a Ruling, SSR 03-2p, to explain its policies for developing and evaluating disability

claims based on RSD." *Brooks v. Barnhart*, 428 F. Supp. 2d 1189, 1192 (N.D. Ala. 2006). The

Ruling states, in relevant part:

> Claims in which the individual alleges RSDS/CRPS are adjudicated using the sequential evaluation process, just as for any other impairment. Because finding that RSDS/CRPS is a medically determinable impairment requires the presence of chronic pain and one or more clinically documented signs in the affected region, the adjudicator can reliably find that pain is an expected symptom in this disorder. Other symptoms, including such things as extreme sensitivity to touch or pressure, or abnormal sensations of heat or cold, can also be associated with this disorder. Given that a variety of symptoms can be associated with RSDS/CRPS, once the disorder has been established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.

SSR 03-2p (citations omitted).

Plaintiff was diagnosed with RSD in July 2015 when she saw Dr. Mallempati (Tr. 439). Plaintiff saw Dr. Mallempati for a block at left L2/L3. (*Id.*). In his notes, Dr. Mallempati noted that under Plaintiff's preoperative diagnosis and postoperative diagnosis Plaintiff had "reflex sympathetic dystrophy lower extremity." (*Id.*).

Plaintiff argues that the ALJ failed to consider and failed to show that she considered Plaintiff's RSD diagnosis. Also, because she failed to consider the RSD, the ALJ did not apply SSR 03-2p, the SSA's ruling governing an ALJ's analysis of claims involving RSD and in doing so also failed to properly evaluate her pain consistent with the Eleventh Circuit's "pain standard." (Doc. # 11 at 18-19). The court agrees.

The ALJ's decision does not indicate whether RSD was considered in assessing Plaintiff's "severe" impairments or Plaintiff's "medically determinable impairments." (Tr. 23-39). In fact, the RSD diagnosis is not mentioned anywhere in the ALJ's decision and neither is Plaintiff's visit to Dr. Mallempati. (*Id.*). Additionally, the ALJ did not mention SSR 03-2p or indicate that she had applied that ruling. (*Id.*).

Defendant argues that "the ALJ committed no error in failing to find reflex sympathetic dystrophy (RSD) a medically determinable impairment when it was diagnosed on a single

14

occasion; by a one-time provider; and not treated, discussed, or otherwise mentioned thereafter." (Doc. # 15 at 1; *see also id.* at 6). But that argument is unavailing. While the ALJ *could* have found that the RSD diagnosis did not constitute a medically determinable impairment, the decision indicates that Plaintiff's RSD diagnosis was not considered at all. Therefore, the ALJ did not include any explanation as to whether the RSD diagnosis was a medically determinable impairment or not.

As the Eleventh Circuit has held, "an ALJ cannot merely stated that [s]he 'has carefully considered all of the testimony . . . and exhibits." *Rodriguez v. Comm'r of Soc. Sec.*, 737 F. App'x 514, 517 (11th Cir. 2018) (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). "Instead, the ALJ must 'state specifically the weight accorded to each item of evidence and why he reached that decision.'" *Id.* (quoting *Cowart*, 662 F.2d at 735). Because the ALJ did not specifically state the grounds for determining that Plaintiff's RSD was not a medically determinable impairment, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of this claim is rational and supported by substantial evidence." *Cowart*, 662 F.2d at 635.

Particularly relevant to RSD, "[d]istrict courts within the Eleventh Circuit routinely hold that the failure to assess the claimant's [RSD diagnosis] in accordance with SSR 03-2p undermines the ALJ's determinations with respect to medical opinion evidence, Plaintiff's credibility, and RFC determination." *Channell v. Kijakazi*, 2021 WL 3131669, at *6 (M.D. Ala. July 23, 2021) (quoting *Carroll v. Berryhill*, 2017 WL 559581, at *4 (M.D. Ala. Feb. 10, 2017) (in turn citing *Volk v. Astrue*, 2012 WL 4466880, at *4 (M.D. Fla. Sept. 27, 2012))). As one district court has put it, "[t]he Commissioner is required at Step Two in the sequential analysis to address each impairment of the claimant and determine if it is a severe or non-severe impairment. Since RSD is often a

notoriously difficult and elusive diagnosis to make, the Commission has adopted a specific set of rules associated with the evaluation and assessment of this condition." *Hoyle v. Colvin*, 2014 WL 7369428, at *5 (D.S.C. Dec. 29, 2014). As the court went on to explain, "[t]he Commissioner is required at Step Two to determine if RSD is a severe impairment if the condition is documented in the medical record. Among the signs and symptoms of RSD noted in the rule include the presence of chronic pain out of proportion to the injury and the presence of one or more signs in the affected extremity of swelling, changes in color, changes in texture, and/or changes in temperature." *Id.* (citing SSR 03-2p).

Plaintiff received a definitive diagnosis of RSD from Dr. Mallempati. (Tr. 439). Additionally, other doctors that she saw noted that she had swelling and alleged severe pain. For instance, when Plaintiff saw Dr. Connor on June 16, 2015 (after undergoing her left knee arthroscopy), she complained of left knee pain and swelling. (Tr. 484). Plaintiff saw Dr. Connor again on July 9, 2015, complaining again of left knee pain and swelling. (Tr. 487). She saw Dr. Mallempati after that visit. (Tr. 439, 487). On August 5, 2015, after seeing Dr. Mallempati, Plaintiff informed Dr. Connor that she still was experiencing pain and wanted to go forward with the left total knee arthroplasty. (Tr. 489).

Again, Defendant argues that the ALJ did not commit an error by not assessing RSD as a medically determinable impairment because "the diagnosis of RSD was noted on a single occasion by a provider Plaintiff saw only once in July 2015." (Doc. # 15 at 6). However, considering the caselaw surrounding RSD diagnoses, this argument falls flat. "'[M]ultiple district courts have held that when a plaintiff has been diagnosed with [RSD] by two or more physicians, a medically determinable impairment has been established and an ALJ's failure to address these diagnoses during the sequential evaluation process constitutes reversible error.'" *Id.* (quoting *Paschal v.*

*Berryhill*, 2018 WL 4095100, at *4 (N.D. Ill. Aug. 28, 2018) (citing cases)). "Further, '[a]t least four district courts have found reversible error where an ALJ failed to address [RSD] and SSR 03-2p in the sequential evaluation process where only a single treating physician diagnosed the plaintiff with [RSD].'" *Id.* (quoting *Paschal*, 2018 WL 4095100, at *4 (citing *Scott v. Colvin*, 2017 WL 1243154, at *8-10 (M.D. La. Feb. 24, 2017); *Hoyle*, 2014 WL 7369428; *Perez v. Astrue*, 831 F. Supp. 2d 1168, 1176-77 (C.D. Cal. 2011); *Songer v. Astrue*, 2011 WL 849961 (S.D. Ind. Mar. 9, 2011)). Accordingly, the fact that Plaintiff was diagnosed with RSD only once does not foreclose her argument, especially in light of the fact that she presented other symptoms consistent with an RAD diagnosis and that may be associated with it. (Tr. 484, 487, 489). Further, although swelling was not listed in every treatment note from the physicians Plaintiff saw, SSR 03-2p specifically provides that "[i]t may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of [RDS], and do not affect a finding that a medically determinable impairment is present." SSR 03-2p.

While Defendant may be correct that "Plaintiff's other impairments [may] also cause swelling" (Doc. # 15 at 7), this does not change the fact that the ALJ did not consider the RSD diagnosis. It was never mentioned in the ALJ's decision. The court understands that "'the mere mention of [an RSD diagnosis] . . . does not equate to an evaluation of the intensity, persistence, and limiting effects of a claimant's [RSD] as required by SSR 03-2p.'" *Channell*, 2021 WL 3131669, at *6 (quoting *Carroll*, 2017 WL 559581, at *5 (in turn citing *Volk*, 2012 WL 4466480, at *4)). Here, the ALJ made no reference to Plaintiff's RSD diagnosis, must less evaluate the effects of the diagnosis as required by SSR 03-2p.

For these reasons, the court finds that the ALJ's failure to properly address RSD at step two in the sequential evaluation process and thereafter is error that requires reversal and remand. *Channell*, 2021 WL 3131669, at *7. To be clear, the court is not suggesting that Plaintiff is disabled, as Plaintiff "'bears the burden of proving that [her] [RSD] is a severe impairment at step two of the sequential evaluation process.'" *Channell*, 2021 WL 3131669, at *7 (quoting *Scott*, 2017 WL 1243154, at *12). However, the ALJ's failure to address Plaintiff's RSD under SSR 03-2p results in a failure to meet the substantial evidence standard and a failure to apply the proper legal standard. *See id.*; *Paschall*, 2018 WL 4095100, at *4. The ALJ's evaluation of the totality of the evidence is inconsistent with the instructions found in SSR 03-2p and in accordance with its directive, the ALJ must properly evaluate Plaintiff's RSD diagnosis. The court makes no further findings or conclusions about any of the additional issues raised by Plaintiff.

## VII.    Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is neither supported by substantial evidence nor based on proper legal standards. The Commissioner's final decision is therefore due to be reversed and remanded. The ALJ is directed to (1) evaluate Plaintiff's RSD diagnosis in accordance with the provisions of SSR 03-2p, including an evaluation of the intensity, persistence, and limiting effects of her symptoms and (2) conduct any other proceedings deemed appropriate. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this September 3, 2025.

R. DAVID PROCTOR
CHIEF U.S. DISTRICT JUDGE

18